This is the 23rd of April, 2019. We are here at the OSU General Hall. We will be practicing 10 minutes for the plaintiff, 5 minutes for the defendant, and 15 minutes for the defendant. During the weekend, we will be practicing on the 2nd floor. Good morning, Your Honors. May it please the Court. I'm joined at the council table this morning by Bruce Fox, who is also plaintiff's counsel, and Alexandra Brodsky for amici. 42 years ago, in Beverly Hills Fire, this court observed or warned that there's a danger that bifurcation may deprive a plaintiff of their legitimate right to put before the jury the circumstances and atmosphere of the case they've brought into court. Replacing it instead with a sterile or laboratory atmosphere. And it's plaintiff's position, appellant's position, that that's exactly what happened in this case. The district court chopped her claim up and adopted an excessively narrow standard of relevance for the evidence that could come in at the liability phase. And prevented her from presenting vast swathes of significant corroborating evidence that would have supported her claims or undermined Dr. Mazzoni's defense. I thought it was kind of like circumstantial evidence. I mean, viewed from the question whether there was improper touching. So the evidence you're talking about is circumstantial evidence that your view makes it more likely that that touching happened and was of a sexual nature. Is that fair characterization of your position? That is correct, Your Honor. That is our position. Just cite one example, or I guess two examples. The district court prevented Ms. Hwang from the quasi-subpoenas that Ms. Hwang had issued to OSU medical providers that she'd seen about the emotional and psychological trauma that she claimed she suffered as a result of the unwanted touching. The district court's reasoning was that that evidence didn't prove that the touching occurred. But, of course, a jury could infer from the fact of medical diagnosis of emotional and psychological injury that Ms. Hwang was subjected to unwanted sexual touching. You know, as I read the appellee brief, or at least parts of it, it seemed to leave an impression, and I'm not saying this is intentional or inaccurate, but it seemed to leave an impression that most of the circumstantial evidence that you wanted to bring in was kind of, it was after all of the alleged sexual touching rather than during or before. It was all kind of post hoc, and the court seemed to think that. And I just want your characterization of the evidence that you would have brought in in a trial that had a broader lens. Sure. Which is, you know, did it, was it all like post, after the fact, or was it intertwined with the events that, you know, the touching stuff? I guess my answer would be both. So, on the one hand, there's the medical evidence, which came after. There is, for example, Ms. Hwang went on to pass her candidacy exam just three months after. Could there be some before examples? Sure. Because I'm wondering, it raises the question, are there before examples? Or, you know, at the same time, you know, contemporaneous or post hoc? What are some contemporaneous? Sure. So, these would be things like Rizzoni's treatment of Ms. Hwang and observations of people of his treatment of Ms. Hwang throughout their relationship. So, for example, you know, Rizzoni, the case Ms. Hwang wanted to put on was that Rizzoni engaged in a pattern of grooming and escalating sexual abuse. So, grooming is like before. Correct. Correct. And so, it starts in, and this did come in at trial, it starts when they first meet in Shanghai. But then it continues. And what we see is, you know, this circumstantial evidence shows a pattern that during the first three or four semesters of her time at OSU, she is generally compliant with his demands to come in and have these one-on-one scenarios with him. And then as her resistance mounts and as she starts to try to avoid him, you know, he starts engaging in sort of more, less carrot and more stick. Right? And so, there are emails like, for example, and plaintiff's counsel tried to get this in at trial, and this is one that the district court excluded. You know, Rizzoni says to her, perhaps you can talk to the law professors and ask them to pay for your GRA stipend, supplement, and tuition and fees. I am clearly not getting my money's worth. And in some other emails that he didn't. When does he say that in an email? Sorry? When is that email? That is from January of 2016. Okay. All right, Junior. Okay. And just, you know, one other example. In September of 2016, he comments in an email, my other 11 PhD students are all great partners who helped me as I helped them. You are a net negative burden on me because you cost me money and give back nothing. And you couldn't put this in during the touching, you know, the first part where you were trying to figure out whether she was touched?  The district court referred to these as academic disputes that he was not going to allow to come in in front of the jury. Did it come in at all? Because the court seemed to think that most of it came in one way or another. I think, Your Honor, a tiny bit of it came in. Did that email come in? The last one I just read to you? No, I don't believe so. All right. Are there academic issues? I mean, there's a good amount of evidence that came in about the touching. Correct. And there's a sort of, you know, related or maybe separate category about her academic issues and why she failed the exam. A lot of that was sort of carved off, right? Correct. And there was a lot of, that was sort of some good, some bad, right? There were a lot of reports from people on the committee who said she was very poor in the interview and it was very understandable why she didn't pass. And that information also didn't come in, right? That's correct. So it's kind of a mixed bag. When you get to the educational piece of it, it's kind of a mixed bag, stuff going both ways. That is true, Your Honor, but I would point out that, you know, the people in the courtroom who are supposed to sort out that mixed bag are the jury. And by not letting any of it in, plaintiffs or defendants, good or bad, you know, like the Beverly Hills Fire case, that is the court. I thought maybe your side had some resistance to letting all of this in as well because it wasn't, you know, arguably a separate issue or, you know, it's related but not fully related. And the evidence wasn't totally one-sided. There's a lot that wasn't very helpful for your client. I read the record and think that you didn't necessarily want all of this in. I think plaintiff's position would be that if it all came in, the jury would have resolved it in her favor. You know, some of it did come in. More of it came in on the defendant's side. So, for example, you know, the testimony about Ms. Huang missing meetings with her second Ph.D. advisor. But the things that didn't come in were like Doug Anderson's testimony about her exceptional performance for other, Dr. Subramanian's testimony about her ability. You know, so there's evidence that goes both ways to be sure. But we believe that if it all come in, the jury could have resolved it in Ms. Huang's favor. But as you know, it does go both ways. I would like to move on and just briefly touch on the district court's dismissal of Ms. Huang's retaliation claim at summary judgment. Briefly because we're running out of time, I guess. I see that, Your Honor. The comment I just want to make is that this court has recognized that just saying no to your supervisor, to a harassing supervisor, can be sufficient to trigger the opposition clause. And Ms. Huang's position is that physical rejection speaks just as loudly as verbalization. And so the evidence here that she pushed Rizzoni's hands off her, that she physically maneuvered herself away from him, that should have been sufficient under the law. Can I ask you one question about the retaliation claim? Sure. So the retaliation claim was all based on physical – it can't be based on the filing of the report to Ohio State because that comes late. Correct. Later. And so the retaliation claim is during the series of events, he would make physical advances and she would push him away. And that was her rejecting his advances and then retaliating against her. We see it as escalating retaliation that ultimately leads to, in August 2017, he decides to remove her supplemental stipend. And then in November, December, works to have her removed from the program and also removed from the Ford University Research Project and dismissed from the Automotive Research Center. I guess I – the jury found there was no inappropriate touch. And so I was wondering how that – what that does to your retaliation claim. Yes, I understand you lost on summary judgment. But the jury said there was no inappropriate touching. The retaliation claim was largely and exclusively based on the touching and she saying no. Right. So the basis of it was the appropriate touching and the jury said it didn't happen. So just in light of the verdict, we're trying to figure out what – Right. I would just – I think from plaintiff's perspective, we would characterize the verdict a little bit differently than that. The jury was asked – if you read the verdict sheet, this is 7708. Do you find by preponderance of the evidence that defendant engaged in a pattern – this is the first question, then it goes on to individual instances – engaged in a pattern of nonconsensual sexual touching of plaintiff during the timeframe, et cetera, et cetera. So the question the jury was asked wasn't did this happen, yes or no. It was did plaintiff meet her burden. There's a second question. I also have that. There's the second question where they say were there any instances of inappropriate touching and the jury says no. My point, Your Honor, is that the verbiage is the same. Do you find by preponderance of the evidence? So the jury could have found the scales were inequitable. Maybe yes, maybe no. There's not enough for us to tip to yes. You know, you have to prove by preponderance. So if you didn't prove and that's the standard you need, you want a new trial, right? Yes, absolutely. We want a new trial. And if I may just answer Judge Radler's question, which I deflected a little bit from. That happens a lot. So I think with the retaliation claim, you know, the fact of touching is not necessarily coextensive with unwanted sexual advances. And I think the constitutional dimension of the 1983 claim also, there's a distinction there. So I guess I don't think that there would be a necessarily be a preclusive effect of, you know, if the jury's verdict stands on the retaliation claim. Okay, thank you. You'll have your rebuttal. We'll hear from Ms. Brodsky. Thank you. Good morning. I'm Alexander Brodsky. I'd like to speak to the threshold question for Ms. Wong's Title VII claims, which is whether she was an employee. In determining whether a plaintiff is an employee protected by Title VII, this court uses the common law. You can see that. Can I just ask you, did she preserve this issue in the district court? Your Honor, my view is yes. So Ms. Wong clearly argued in opposing both the motion to dismiss and the motion for summary judgment that she was an employee protected by Title VII. Well, we're looking at the motion for summary judgment. The summary judgment was granted against her. She'd have to renew any argument that she made a motion to dismiss at the summary judgment stage, right? Yes, Your Honor. So we should look at, I mean, my mind would look at the summary, what was proved at the summary judgment. Yes. So she argued in opposing summary judgment that she was an employee. And I know that the university zeroes in on co-referencing the graduate research associate position there. And some context that I found helpful coming to this for the first time on appeal is that in Ms. Wong's counterstatement of material fact on summary judgment, she calls herself a graduate research associate for the whole time that she worked under Rizzoni. I think that that's probably wrong. I think the better evidence is that she was a graduate fellow for part of the time. But Rizzoni also testified in his deposition that she was a graduate research associate for the whole time that she worked under him. So he said – In the two titles, again, there was the fellow. Can you just tell me? Sure. So one is graduate research associate, which is the first offer she's made.  And everyone agrees that she's an employee in that role.  Wong then gets another letter that says, congratulations, you're being funded differently now, so we're going to call you a graduate fellow. Okay. But Rizzoni testified – And they say that's a mere student. Yes, that's right. That's right. But Rizzoni testifies, and this is 991 at PHID 3957. He says that Wong entered my lab as a graduate research associate. So I think that that helps with the forfeiture point in that I think it's clear with that context that what Wong was arguing was I was an employee and I worked for Rizzoni, that she was not distinguishing between these two roles. I also think it helps substantively because it shows that these were interchangeable roles that were different in title only. And this court has made clear in cases like Bryson that the court doesn't defer to how a defendant labels a plaintiff. A plaintiff can be an employee even if the defendant calls her something else. And that's an important point for graduate student workers because schools have every incentive to call them – Yes, just in terms of – I appreciate that it's – the question of what her function is, what she was actually doing is a hard one. You may well be right about that. I was just concerned about the preservation issue because setting aside whatever's in the testimony, we have the motions argued to the district court judge. And you have basically one footnote on this point where Ojasi has teed up the question that there's a break in job function and later on subsequent job, yes, employee, but we're saying previously not. And she says having separately obtained employment as a graduate research assistant, she is protected by Title VII and she cites one case. And they agree that when she was a graduate research associate, right, that she was an employee. So she doesn't really take on the issue the way it was teed up by the university. And then the district judge seems to follow that dichotomy and say everyone seems to agree that afterwards but didn't read your client's argument beforehand that she was also an employee. I understand the concern. In cases like Medical Center at Elizabeth Place, this court has made clear that parties aren't constrained to the precise contours of the arguments that they made below. And in the context of the counterstatement of material fact, which was supported by record evidence, I think it's clear that Juans aren't arguing that she was an employee the entire time she was working for Rizzoni. My understanding in reading the opposition to the motion of summary judgment is there may have been some mistake, and it sounds like also from the professor, some mistake of calling it a GRA for the entire time. But we're very clear on the dates, right? We have the dates here from enrollment and at the College of Engineering and what happens with her then. We have other references throughout the motion for summary judgment starting from March of 2014 through December of 2017. So that would cover the periods that she was a fellow as well, right, because when she was first enrolled, she was a fellow in 2014. So we may have some confusion about particular titles, but we have a date range and conduct over a date range. That is discussed in the opposition. Is that right? That's correct. And I would say that Juan's responsibilities during that full period were the same. And just in brief, OSU paid Juan to do work, a specific assigned project. That was part of the research that OSU had promised for in exchange for funding. That was OSU's regular business. It was part of this long-term economic relationship. And OSU exercised control over how long did that work, when she did that work, when she could go on vacation. They provided the instrumentalities and tools. So that creates at least a jury question about whether OSU was her employer during that time. You know, I mean, I wanted to ask you about whether this is a jury question or a question for the court. I mean, correct me if you think otherwise, but it would seem like to the extent there are disputes about whether certain facts actually existed. You know, whether he told her you can't go on vacation on this particular week or not. Whether that happened, that's a fact question. That would go to a jury. But isn't the determination whether a person is an employee based on determined facts, isn't that for the court? Not a jury. Jury's not going to make that assessment, right? Not necessarily, Your Honor. Certainly a court can determine on summary judgment that someone was not an employee. I mean, courts can determine, decide fact questions all day long in this jail. You know, if a jury could only find the relevant facts one way, right? But, I mean, just to be, I mean, I just want to be clear about how we're thinking about this issue. You know, there are disputed questions of fact potentially, but once those are resolved, doesn't the court look at the factual landscape and the court makes a determination whether somebody's an employee under legal standard or not? Isn't that a legal question at that point? The court, I don't mean to dodge, I think it really depends on what the facts are and what the disputes are. So some of this comes down to matters of degree, and that could potentially be a jury question, which is, okay, you know, there are emails where Rizzoni said, I'm mad at you that you didn't tell me when you were on vacation. Hwang says, actually, I did. I did ask you for permission here. Now, there could be a question about, is that the kind of control that we experience our employers exercising over us, over our schedules? Or is that something lower, and that could be a question for the jury. But there certainly are questions here that really go to, did this happen or not? And those are certainly in the jury's court. So, okay, I wanted to ask you, I mean, because it seems like a lot of the facts that you're pointing to maybe really aren't disputed all that much. I mean, emails are emails, right? There's no fight about authenticity. And so I guess I wanted to ask you, what, if any, questions factually do you think really are disputed, as opposed to basically, you know, most of this is undisputed and the court had one determination and you think there should have been another? Sure. So, I guess starting with the district court opinion, the district court didn't consider most of this evidence. So the district court really relied on OSU's characterization of Hwang's role and of the appending component. So, for example, the district court says... Okay, but since we're in the red zone, my question is, what, if any, questions factually do you think are disputed, as opposed to, you know, they're not disputed and it's just, what do we make of them? So, I think that there are questions, for example, about whether the stipend that Hwang received was akin to an academic scholarship or it was the money that she was being paid to do the work that OSU offers to the world. That's OSU's product. If the court wants to determine that actually motion for summary, that summary judgment should have been granted for Hwang on the question of whether she was an employee, we certainly would not argue with that. Is there a dispute, and maybe this is a better question for your friend, but is there a dispute about how much Professor Rizzoni controlled her working hours? I mean, I remember her testimony that she had to be there at particular hours and that was something that was controlled and said and I seem to remember that that was disputed. Maybe there was an agreement that you had to be at some particular meetings, but in terms of just, like, being at the lab during working hours and having that much control, is that a disputed fact? I think that it is not a disputed fact that Rizzoni exercised some control over when she had to be there and that's not something that the district court considered. And so, I agree that I don't think that the primary issue here is that there are lots of facts here where the district court drew the wrong inference. I think it's that there's a lot of evidence that, at least from the face of the district court opinion, the court didn't consider. But I could imagine that being something that, during any questions about that trial, that Rizzoni would be able to speak to. Any questions? All right, thank you. Thank you for your brief. We appreciate it. And we will hear from Mr. Gerrish. Good morning. Thank you, Your Honor. This is Jeff Gerrish. May it please the court, Jeff Gerrish, on behalf of defendants, OSU, and Dr. Rizzoni. I think it's helpful in this case to just, even in analyzing these issues, to just take a step back and look at the big picture. Mrs. Fong alleged that Dr. Rizzoni engaged in a years-long pattern of unwanted sexual touching and she never said a word to anyone, even to Dr. Rizzoni. She never said anything to anyone until after an unbiased committee that didn't know anything about that and they unanimously concluded that she'd failed her duty. Can you imagine a theory where she's just trying to keep the status quo so she can get a better educational program? Exactly. So this is not that, this part, this theme is not that compelling to me. But I would just add this. As soon as she did say something to anyone, Ohio State did exactly what they should have done. They immediately cut off any communication between Dr. Rizzoni and plaintiff. They gave her the resources she needed. They conducted a thorough investigation and got statements from 30 people, none of which corroborated any of what she said. Can I follow up on Judge Riddler's questions about your preservation argument on this employee-student question under Title VII? Did you argue that the applicable test that the district court needed to use was an agency, kind of a common law agency test or an economic realities test? What was your argument about the test that the district court was to apply? Our argument was that she was an employee, she was a student, not an employee, based on the offer that was given her, which was to be a graduate. Your argument was completely based on titles? No, not necessarily. The affidavit that we submitted said she's an employee because she's a graduate fellow. It was, to an extent, based on titles. What was the test that the district court was supposed to apply based on your brief? What did you offer the district court? This is how you decide whether she's a student or an employee. We offered the affidavit support that she was a student. But like a legal argument. I don't know that we gave a legal testament to determining in this case. Did you now just, did you waive all argument that if we apply an agency test as opposed to a test based on whether she's a fellow or a GRA, that she's not an employee? Because you didn't make an argument. We made the argument based on the only admissible evidence that was submitted. But outside of evidence, there's the law and there are standards that district courts apply to determine how the evidence falls within. Are you in Title VII land? Are you in Title IX land? What are we looking at? I'm trying to get at, did you make an argument that we apply a particular standard, which is our applicable standard in our court, which is an agency to the standard? And if you didn't make that argument, what are we supposed to do? I think in the context of summary judgment, my understanding of how it works would be this. We submitted evidence that she's a student, not an employee. In response, they conceded that they didn't make any argument that a graduate fellow is an employee. They didn't argue it at all. But they argued that since 2014, the types of evidence of the relationship here since enrollment, that they were unchanged. The thing about the stipend and the working hours and the laboratory and having to go in and being told that you have to do research in a particular area. These are constants. No, they didn't argue any of that. The only argument they made is that she was a graduate research assistant, which is in paragraph four of their statement of facts, which is incorrect. And they cited Dr. Rizzoni's testimony that a graduate research assistant is an employee, generally. They completely disregarded the fact, the undisputed fact, that she was a graduate fellow that was there for her studies. And based on the letter that was sent to her, it said you will have no research assignments. One more follow-up question on this. Can you make clear to me, I have a little bit of a hard time figuring out, what changed in the relationship with Rizzoni? And I'm not talking about the touching, I'm talking about the terms and conditions of what she was supposed to do, whether we consider her a student or an employee. What changed when her title changed? When her title changed to be graduate research assistant? Yeah, she was a fellow, then she was a G.R.A. Functionally. Functionally, like what happened? Did she not have to go in as much? Did she now have control over her research? What changed in the terms and conditions of her enrollment or existence at OSU? I don't know all the changes that were. Well, start me with you. She received more duties in terms of being involved with the research. When she began, she did not have any research assignments. But didn't he pick her research topic at the beginning and send her to Ford on a particular thing? How is that not a research assignment? Because she didn't necessarily have to do that. And this is the emails that Brother Counsel cited are the January 26th and September 2016 emails. Our page ID is 2374 and 2375. And this is important. Dr. Rizzoni is telling her, you're a terrible student. You're not following any of my advice. You're not taking the classes I want you to take. You're doing something else. You're not appearing for things that I'm asking you to do this. You can do this on your own, but you're not likely to pass your exam. The point is what they're calling control was advice to a student, and the emails prove as much. Okay, so that might be a – I take your point. That's maybe a question about is that relationship more of a student relationship or an employee relationship. But, Ken, I would love to get back to my question about, like, the functional difference that changed when she was a GRA, when she became a GRA. Did she, like, get more health care benefits, like more wages? Like what would make her an employee one time and not another? What functionally gives her an employee status then that she didn't have before? One or two things. Yeah, I think she had less control over her duties in terms of the research and the involvement with the project. The initial project for Ford was an internship. It sounds like shades of gray. Is that it? What else do you have? In this instance, it might be shades of gray. In general, a graduate research assistant, which is an assistant position, the very word shows. I guess, you know, when I read the description of her work with Ford, where, you know, there's these weekly, like, Zoom type calls or whatever, she's assigned, she has to go with him to Ford, right? You know, she's doing research. I mean, I look at that and I'm like how in the world is this any different from somebody who's just, you know, working for this enterprise? Because the case law, even the case law that they cite, which is the same cases that the judge found on his own and cited, talk about if you're primarily an academic exercise, if you're primarily academic, you're studying to get ready for a Ph.D. Didn't he talk about vacations and stuff like that? It looks to me like he's closely controlling her professional life, so to speak. You know, I want to try to find a neutral word, but her engineering life, whatever. He's closely controlling it. In a way, I mean, you know, we've all worked up here. You look at that and it's like, that looks like you could be working for Procter & Gamble or whatever with this kind of regimen, this kind of control. Like, what am I missing? She's taking classes on the side as well. I think you're, Judge, I think you're missing a couple things in terms of the law and a couple things in terms of the facts. It wouldn't be the first time. Go ahead. No, it probably would be. In terms of the law, they don't cite any authority for the notion that someone like a graduate fellow who's primarily academic. Let's say I don't really care about the titles, okay, and I'm just looking at how things work functionally. There's no question that he started to exercise more control over time as she wasn't doing what she should be doing to get her Ph.D. I mean, what those things... I'm sorry, go ahead. No, and this is why I go to the emails. By 2016, she's not present. I mean, it's not a matter of vacation. She's not showing up at things. She's not doing what she's supposed to do. She's not taking the classes that you advise her to take and not doing the research she's supposed to be doing as a professor. Didn't he at one point say, take fewer classes because I need you to be doing this work over here to get my money's worth? I don't know that he specifically told her to take fewer classes. He talks about getting his money's worth. Isn't that an odd thing to say to a student? I mean, he said that repeatedly. He said a lot of different things to try to inspire her to start doing what she was supposed to be doing, including an offhand reference to the fact that she is getting a scholarship. She's getting a scholarship which was increased by way of a stipend. I mean, NCAA football players get scholarships, too, and query whether they're just students. I think they probably are students. I think they're more students than employees. We'll see. I don't know. Interesting case. That's not the case. And I want to just come back to Judge Radler's point. This is not exactly a very good case to be having this academic exercise when they didn't argue any of this in the trial court. Can I ask you one related question? Sure. So this is well, the Meek's brief is very helpful. This is very well briefed in this court. And one of the challenges of our job is we have to go back to the district court and figure out what was presented in the district court, because we have preservation requirements and we want the district court to rule on issues first. In my view, I think Judge Blomkamp's questions help reveal this, it wasn't briefed well on either side, really. And the district court does find, or does conclude, that the plaintiff was not employed by the university until she was appointed as a graduate research associate in late August 2017. So he takes this, I think, not particularly good briefing on either side, and this is his conclusion. Were there motions for reconsideration following that ruling? Was this issue re-raised with the district court at all? No, I don't believe it was. And that's why, you know, in the district court's defense, all he can do is deal with the arguments made to him. They never made the arguments that a graduate fellow is an employee. And so what's the district judge supposed to do with that? I mean, based on the evidence and the arguments made to him, he said it's undisputed, she's a graduate fellow. They thought she was a graduate assistant, which she wasn't. A graduate fellow is a student, not an employee. They've never argued to the contrary. So, I mean, faced with that, the judge did the right thing in granting a summary judgment on this issue, and they never re-raised it. They didn't re-raise it. We should talk about the tri-part thing soon. Go ahead. I just wanted to circle back and just try so I can look later. Where's the testimony in the record about how things change when she becomes the GRA? Like how the things on the ground. You said he actually had more control when she became a GRA. Where do I look to have that? I'm not sure, Judge, and I apologize. Again, because this is not something that they'd ever raised, and it's made it difficult to try to go back and figure out. Well, you're the person who said that when she became a GRA, something changed and she became an employee. So I'm trying to figure out whether you made that argument. I'm the functional employee. Fair enough, Your Honor. And I would have to concede, it's just my sense that over time that's how things change based on my general recollection of the record. I can't think of a specific record item that says this changed, this changed, and this changed when she became a research associate. And what do we make of the fact that Rizzoni thought she was a GRA for the whole time? She testified that she came in as a GRA and treated her then as a GRA. And even if she was technically something different, he's calling her a GRA. I don't know where he said that he thought she was a GRA for the entire time. Well, he testified that she was a GRA. He testified that a GRA is an associate. He testified that she was a GRA as an employee. And he testified she was a GRA at one point.  We should move on to another question. We'll look at it. So, I mean, this trifurcation, you know, I mean, a trial is like an organism. You know, I mean, there's a dynamism, like, within it. And why, I mean, the district court's ruling kind of amounts to a categorical determination that all circumstantial evidence, i.e., evidence beyond he grabbed my elbow, he touched my buttocks, okay, everything else is irrelevant to the determination whether those grabbings and touchings happened. And if that's an accurate characterization here, because it does seem like, and I know you think everything came in, but just looking at the trifurcation itself, if that's an accurate characterization, how do you defend that unspoken premise that all this stuff fails to meet the pretty lenient standard of relevance? Well, grooming and her, after the fact, statements to other people, they don't shed any light on whether there was actual sexual touching. Why in the world wouldn't grooming shed light on whether the person tried to do the thing for which they're grooming the person, right? Because, well, your understanding of grooming, Judge, I think is better than theirs has been. They're very loose in terms of what they define grooming. They talk about grooming in terms of criticism and threats, essentially, and that stuff did come in. But the point is, no criticism, no threats, or anything under their definition of grooming sheds no light on whether there's an actual touching. She testified that there was a touching. This is her main claim. She got her day in court on this. She tried the case. The jury didn't believe it. Wait a minute. I mean, Mr. McKeegan gave a number of specific examples of circumstantial evidence, some of which was not after the fact, all right? So why is, I mean, and I wish I could recall them better as I sit here, but why do you think that evidence of those circumstances, his angry reactions, you know, reducing her, taking away the discretionary 10% stipend, why is all of that just categorically irrelevant to whether he's trying to, you know, force himself on her? Because it's trying to reverse engineer it. No, it's not. It sure is. It's during, well, I mean, their point would be he's punishing her because she's not complying with his advances in real time. Why wouldn't that be relevant, just as a general type of evidence? If he's criticizing her or taking adverse action against her, it's because she's not doing what she's supposed to do as a student. You see, that's exactly the dispute, though. Why in the world does the district judge or this court get to decide whether he's reprimanding her because she's failing as a student or whether it's actually because she's pushing his hand away? That's exactly what the jury should sort out, isn't it? But she, I know you said this was a premise. This stuff did come in. I think it has to be emphasized. That's the key. And he even asked him if there's anything else. I asked Mr. McKeegan about, you know, particular pieces of evidence in e-mail, and he said it didn't come in. Yeah, because the e-mail that gave you the page numbers, it doesn't shed any light on whether there was a touching. Well, I mean, it seems like a very constrained sense of relevance. It really does. Do you think that it was relevant outside of the system? Do you think there was a relevant question for the jury as to whether she was a good and capable and smart student? Do I think it was relevant? Yeah, relevant at the liability piece of the trial, this part of the trial, whether she was, like, a good and capable and smart student. Not really, I don't think, because the only issue— Because I kind of, as I was reading it, it seems like, you know, a major thrust of this defense was, like, she wasn't very good. She wasn't smart. She failed this thing. You know, she didn't even have the capability to be able to take this thing again like most students. And, you know, she just wasn't smart. And then when she failed, she lied about it. She lied about the touching. So it seems like whether, you know, a huge part of the defense was to impugn her credibility and her competency as a student. Was that not relevant at all? Well, it's relevant in the sense that all this other stuff did come in, all these negative things that happened to her. And then it becomes relevant because we're explaining why the negative stuff happened. Okay, so you're explaining why the negative stuff happened, right, by saying, well, this all happened because she's a bad student. Should she then be able to say, no, no, no, I was a really good student and have, I think your colleague said, have, you know, Mr. Anderson, Mr. Submarinium, and others say, no, like, she got an A's in all these classes. We wanted to hire her right away. Like, you know, she's actually really, really good. You know, and that kind of thing, that wouldn't be, like, relevant. No, I think it would be. And that's why that stuff didn't come in. Yes, it did. She didn't get to testify about this stuff directly, fair. She didn't get to give her side of the story from start to finish about maybe why she was having, I mean, you know, it could be that she was reacting. She was starting to go down as a student because of all this stuff that was being done to her, all these advances that might have affected her performance as a student.  But she never got to tell her side of the credibility story herself to the jury, as opposed to all this sort of, you know, oblique stuff. I think it's fair. Yeah, I think it's fair to say she didn't get to tell her story from start to finish. But that's also why the judge, I think, asked. A lot of this stuff came in, and it's right on page 21 of their brief. Why shouldn't we just do it over? I mean, where? Because he was given the chance to put in the evidence. I mean, but really, I mean, like, you know, for those of us who have tried a case, I mean, it's, like I said, it's an organism, you know? And it's just not the same to sort of separate everything out and look at it in isolation. And, I mean, like, how much time does one put in to figuring out, like, the sequence of evidence and witnesses and exhibits and so on? And to say, like, okay, well, we're two-thirds of the way through this. It seems like it's kind of not going too well in terms of this trifurcation. Is there anything you want to just, like, dump in now? I mean, that's kind of an unfair choice to put counsel to, isn't it? I don't think so, Judge. I mean, in terms of the judge has discretion to, as the court said in the last case, has discretion to run the case, in this case a trial. The judge made a logical call in terms of let's focus on whether there was an actual touching. Any evidence you want to put in of the actual touching she was allowed to do. He then ended up bringing in a lot of other stuff, including testimony of Mr. Anderson for Ford that did talk about good things about her. And a lot of stuff, the criticism that was lodged, including because she was a bad student. So then a lot of it came in. Then the judge said to both sides, a lot of this came in. Should we just bring everything else in at this point? At that point, when they say no, it's on them. He was given an opportunity to let her tell her whole story from pillar to post, and he declined it. At what point was that? How many witnesses were left? I don't remember, Judge.  Maybe you're better. Thank you. So there's no perfect trial. But this one had some imperfections. We'd all agree. Can you help me understand the district court's reasoning at the beginning with respect to the trifurcation? And I think a lot of the evidence relates to her academic abilities and whether she properly failed the exam or whether the professor had his thumb on the scale to help her fail the exam. And the district judge viewed that body of evidence as really going to harm or damages to damages. That was really more of a damages question. The consequences of his actions meant that she had lots of injuries, including the fact she failed her PhD exam. So is that the thinking as to some of this, or am I wrong about that? I think the judge just understood that there was a lot of different kinds of dynamics here, going back to the grooming, the failing, and all this. And the judge made the logical assessment that why don't we focus on her proving an unlawful touching, a sexual touching. Any proof that goes to that, she can bring in. And I think they agreed to bifurcate the punitive damages. And the damages… They objected to this. They objected to the… Yeah, they did. Initially, but until they were given the opportunity to… I understand. Did I answer your question, Judge? I don't know how well I did. Well, I think you did. Do you want to take 30 seconds, Mr. Garish, and wrap up from your point of view? Yeah, thank you, Your Honor. I would just say, you know, in terms of the employee and the retaliation, she was given an opportunity to prove the sexual touching. The jury didn't believe it. And both of those claims are contingent upon her proving what she failed to do. And then just in terms of the trifurcation, it was… They haven't cited any case that suggests this was an abuse of discretion. It was a logical way to do it, and the judge tried to fix it the best he could, even after some of the evidence came in that he initially said was not right. Okay. Thank you. You've been a good sport with the questions, and I appreciate your straight answers. All right. Mr. McKeegan, it looks like you have two minutes. Thank you, Your Honor. I just would like to make a few points. So first, in response to Judge Blomkast's question at the end there, where were we at the point in the trial when the district court sort of mused about whether it had been fair? The evidence was closed. It was the morning of the fourth day of trial, and everybody was getting ready to give the jury their instructions, their final instructions. That's where we were in the trial. So you were involved in the trial for the litigation of the district court, is that correct? No. Ms. Blomkast was represented by a different counsel at trial. All right. I mean, I guess, you know, do you have anything to offer in this question of preservation regarding employee status and whether she made an argument as to why she was an employee before she became a graduate associate, GRA, I guess? You know, I mean, I think Mr. Garrish had said or suggested that the argument, the plaintiff's argument in the district court only concerned the period after she's a GRA, has that title. Do you have anything to offer as to whether, you know, you made an argument before then or as to the time frame before then? I believe what the plaintiff argued, and to Ms. Brodsky's point, there seems to have been some pleading of the GRA versus graduate fellow title, usage of the titles all over the place in this case. What Ms. Blomkast argued at summary judgment was that she worked in the lab and she was paid for it. And the inference was that a jury could conclude from that that she was an employee. It is admittedly, you know, not a lengthy argument. Okay. So you think they made that argument as to the time frame before she gets the title of the GRA? Correct. And I think if you look at the statement of facts and the evidence cited there, that in addition to the payment, you know, there are other indicia of employment, as Ms. Brodsky talked extensively about. There was just to confirm what your friend on the other side said. After this ruling, there was no reconsideration. The issue was never brought to the district judge's attention again. No, Your Honor. I don't believe there was a motion for reconsideration. And if you have to do that, that's fine. I'm sorry. Not that that's – I'm not asking every lawyer to file a motion for reconsideration. I think the district judge might lose it. Including our court. Including our court. But I just wanted to make sure you're in agreement on the record. Yes. And then one issue that I just wanted to touch on briefly. There was a question about, you know, isn't it the case that there aren't really disputed facts about what her job journeys were? And I would just point the court to Bryson and also Lily that while the determination of employee status is a mixed question of law and fact. So even where there are undisputed facts, if there is a dispute about the inference to be drawn from those facts, that should go to the jury. All right. That's helpful. Okay. Great. Well, thank you all. A very helpful argument.